**AMARIN PLASTICS, INC., Plaintiff,**

**v.**

**MARYLAND CUP CORPORATION**
**d/b/a Sweetheart Products**
**Group, Defendant.**

**Civ. A. No. 86–3580–MC.**

United States District Court,
D. Massachusetts.

April 28, 1987.

Charles Donelan, Ann L. Palmieri, Day, Berry & Howard, Boston, Mass., for plaintiff.

S. Elaine McChesney, Bingham, Dana & Gould, Boston, Mass., for defendant.

## ORDER RE: DEFENDANT MARYLAND CUP CORPORATION'S MOTION FOR PROTECTIVE ORDER AND SANCTIONS (DOCKET NO. 4)

PATTI B. SARIS, United States Magistrate.

On December 16, 1986, Amarin Plastics, Inc. ("Amarin") commenced this action against Maryland Cup Corporation d/b/a Sweetheart Products Group ("Maryland Cup") for its alleged breach of an agreement entered into in March 1973, and extended through March 1986, regarding the sale of plastic cutlery by Amarin to Maryland Cup. On February 13, 1987, Maryland Cup moved pursuant to Fed.R.Civ.P. 26(c) and 30 and pursuant to DR 7–104(A)(1) of the ABA Code of Professional Responsibility for a protective order to prevent Amarin's counsel from using at deposition or at trial information obtained by him during *ex parte* contacts with Samuel Shapiro ("Shapiro"), a former president and Vice Chair-

man of the Board of Directors of Maryland Cup, and from engaging in further *ex parte* contacts with Shapiro. Maryland Cup also moved at that time for sanctions against Amarin's counsel for his prior *ex parte* contacts with Shapiro. Amarin has opposed this motion.

### STATEMENT OF THE FACTS

The facts are largely undisputed.[1] On August 31, 1983, Fort Howard Paper Company ("Fort Howard") acquired Maryland Cup Corporation and its wholly owned subsidiary Sweetheart Plastics, Inc. ("Sweetheart"). Shapiro was president of Sweetheart at the time of the acquisition. From the 1983 acquisition, until January, 1985, Shapiro was also a director of Fort Howard. Shapiro retired from Sweetheart in March, 1984. However, he remained president of Maryland Cup, as well as director and Vice Chairman of the Board of Directors of that company, and stayed on the payroll until January, 1985. Shapiro and other members of his family remain shareholders in Maryland Cup.

Since his resignation, Shapiro has, from time to time, assisted all of the above companies in various litigations which have arisen from facts of which he has knowledge. In particular, Shapiro has assisted outside counsel for Maryland Cup in connection with this litigation.

Amarin filed the instant action on December 16, 1986, after the termination of a long-time contractual relationship with Maryland Cup and its predecessor. The original agreement was entered into in 1973 when Sweetheart was wholly owned by Shapiro and Amarin was wholly owned by Richard King ("King"). This agreement was extended up to and through March, 1986 when a dispute arose between Amarin and Maryland Cup. Shapiro was by this time no longer employed by Maryland Cup and was not involved in the decision not to pay the money sought by Amarin.

---

1. No affidavits have been submitted. The facts are derived from the memoranda filed with the Court.

Amarin provides the following description of the meeting between its counsel and Shapiro. When Shapiro learned of King's problems with Maryland Cup, he offered to meet with King's counsel to clarify any factual questions. Counsel for Amarin, Charles Donelan, agreed to meet with Shapiro to verify the facts told to him by King and to determine if there were any other factual matters forgotten by King.

On or about December 15, 1986, Shapiro met with Amarin's counsel. Shapiro was informed by Amarin's counsel that a lawsuit may be filed. Shapiro stated that he was not represented by counsel in the matter and did not need counsel. Further, Shapiro represented to counsel that he was no longer involved with Maryland Cup and that he would be happy to disclose circumstances surrounding the agreement between the parties.

Toward the end of the conversation, Shapiro disclosed that he had been interviewed by Ms. Elaine McChesney, counsel for Maryland Cup. He stated that after her interview she had sent him a letter setting forth the substance of the interview. Shapiro stated that he did not agree with her summary and responded by a letter dated July 7, 1986. He gave Amarin a copy of his letter to Ms. McChesney. Following the meeting with Shapiro, Amarin filed the instant action.

At a meeting on January 29, 1987 between counsel for Maryland Cup and counsel for Amarin, Amarin's counsel disclosed that he had spoken with Shapiro about the subject matter of this litigation, and that he had seen the correspondence from Shapiro to Ms. McChesney. Other than this July 7, 1986 letter, there is nothing in the record indicating that other written communications between Shapiro and Maryland Cup's counsel were disclosed or any other oral discussions revealed.

Counsel for Maryland Cup informed Amarin's attorney that his behavior had violated the canons of ethics and requested a commitment from him that he would not engage in such *ex parte* contacts with Sha-

piro in the future. Plaintiff's counsel, Mr. Donelan, refused to give such assurances.

On February 4, 1987, Mr. Donelan sent a letter to Shapiro, with a copy to Maryland Cup's counsel, essentially stating that he had subpoenaed Shapiro for a deposition, and that opposing counsel had taken the position that he has no right to talk with Shapiro, and inviting Shapiro to come to an *ex parte* interview prior to the deposition.

Maryland Cup moved for a protective order prohibiting any further *ex parte* contacts with Shapiro and sanctioning Amarin and Mr. Donelan for their prior impermissible conduct.

## DISCUSSION

█ As a preliminary matter, this Court must determine its authority to grant the requested relief. Maryland Cup asks this court to issue a protective order pursuant to Fed.R.Civ.P. 26(c) and 30(d) to "prevent further violations of the canons of ethics by plaintiff's counsel and to assess sanctions against plaintiff's counsel." Docket 4. However, Fed.R.Civ.P. 26 contains general provisions concerning discovery. Rule 26(a) lists the specific methods by which parties may obtain discovery, and Rule 26(c) gives the court authority to issue protective orders, for good cause shown, concerning these methods of discovery. Informal witness interviews are not encompassed by Rule 26, and therefore this court has no authority under that rule to issue the requested protective order.

Similarly, Maryland Cup points to Fed.R. Civ.P. 30(d) as the source of authority for issuing the order, but this subsection provides that at any time during the taking of the deposition, a party or deponent may file a motion to terminate or limit an examination. Here, the record does not reflect that the deposition of Shapiro has commenced. Indeed by its very terms, the motion is limited to *ex parte* contacts with Shapiro, and therefore this rule does not provide a source for the court's authority.

In *Roadway Express v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980), the Supreme Court acknowl-

edged a court's inherent power to levy sanctions in response to abusive litigation practices. *See also Sperber v. Washington Heights-West Harlem-Inwood Mental Health Council, Inc.,* No. 82 CIV 7428, slip op. at 4–8 (S.D.N.Y. Nov. 21, 1983) (vacated and withdrawn). A court has authority to issue appropriate orders to prohibit or remedy litigation practices which raise ethical concerns. *Cf. NFC Inc. v. General Nutrition, Inc.,* 562 F.Supp. 332, 333 (D.Mass. 1983). Since Maryland Cup seeks pre-trial orders which are non-dispositive, this court has the authority under Rule Two of the Local Rules for United States Magistrates for the Federal District Court of Massachusetts to rule on the motion.

a. *Alleged Violations of DR 7-104(A)(1).*

■ Maryland Cup argues that a protective order should issue because Amarin's counsel violated DR 7–104(A)(1) by conducting *ex parte* interviews of Shapiro. DR 7–104 provides that:

(A) During the course of his representation of a client, a lawyer shall not: (1) communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

This rule may be violated if counsel communicates with current corporate employees of an adverse party regarding matters within the scope of their employment, since statements by such employees may constitute binding admissions of the corporation under Fed.R.Evid. 801(d)(2)(D). *Mompoint v. Lotus Development Corp.,* 110 F.R.D. 414, 417 (D.Mass.1986); *see also* Massachusetts Bar Association Formal Opinion No. 82–7.

It is unclear under what circumstances, if any, DR 7–104(A)(1) applies to former employees of a corporation like Shapiro. *Compare Porter v. Arco Metals Co.,* 642 F.Supp. 1116, 1118 (D.Mont.1986) (the rule may be violated if plaintiff's counsel interviews former employees of the defendant corporation "with managerial responsibilities concerning the matter in litigation") and *Sperber v. Washington Heights-West Harlem-Inwood Mental Health Council, Inc.,* No. 82 CIV 7428, slip op. at 4–8 (S.D.N.Y. Nov. 21, 1983), *vacated and withdrawn* (DR 7–104 prohibits contacts with a former control-group employee of the adverse party since his acts may be imputed to the corporation) and *American Protection Insurance Co. v. MGM Grand Hotel—Las Vegas, Inc.,* Nos. 83–2674, 83–2728 (9th Cir. Dec. 3, 1984), withdrawn (DR 7–104 prohibits *ex parte* contacts with a "former confidential employee" of the adverse party corporation) with *Wright v. Group Health Hospital,* 103 Wash.2d 192, 691 P.2d 564, 569 (1984) (en banc) (DR 7–104(A)(1) does not apply to former employees since they "cannot speak for the corporation") and Illinois Bar Association Opinion No. 85–12 (an attorney may communicate with a former control-group employee of an adversary party since "former employees are no longer in a position to act or speak on behalf of the corporation").

In 1982, the Committee on Professional Ethics of the Massachusetts Bar Association stated that DR 7–104(A)(1) "applies only to present, not former, employees of the corporation." *See* Formal Opinion No. 82–7. In that opinion, which concerned the effect of the disciplinary rule in *federal* litigation, the Committee reasoned:

Support for the notion that effective representation of counsel is the touchstone for interpreting DR 7–104(A)(1) is derived from the fact that all who have considered the matter appear to agree that the prohibition of the Rule applies only to present, not former employees of the corporation. The reason is that former employees enjoy no present agency relationship that is being served by the representation of corporate counsel.

The principal interest reflected in DR 7–104(A)(1) is the party's right to effective assistance of counsel.

Maryland Cup urges this Court to follow the new official comment to Rule 4.2 of the

ABA Rules of Professional Responsibility which does not differ significantly from DR 7–104(A)(1). The comment, published in 1983, provides, in relevant part, that the rule prohibits:

> communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, *and with any other person whose act or omission in connection with that matter may be imputed to the organization for the purposes of civil or criminal liability* or whose statement may constitute an admission on the part of the organization. (Emphasis added.)

Maryland Cup contends that, although former employees' statements may not constitute binding admissions of the organization, the comment indicates that the rule is sufficiently broad to include former control-group employees whose acts or omissions in connection with the matter in representation may be imputed to the corporation.

■ Even if this language governs the instant dispute, Maryland Cup has not demonstrated that any act or omission of Shapiro may be imputed to defendant for the purposes of civil liability. It is undisputed that Shapiro left the employ of the defendant prior to the contract dispute that forms the basis for the litigation. Maryland Cup has simply stated in conclusory fashion that "it is Shapiro's actions and motives as an officer of Sweetheart at the relevant time which are in dispute and which plaintiff will seek to impute to the defendant organization."

Maryland Cup cites two cases in support of its arguments, but they are distinguishable. In *Sperber v. Washington Heights-West Harlem-Inwood Mental Health Council, supra,* a Title VII case, plaintiff's attorney engaged in *ex parte* interviews with former managers who had both been directly involved with defendant's alleged discriminatory discharge of plaintiff. The court stressed that the former employees were not "merely witnesses to events and actions taken by the defendant organization while they were employed there," but that they were in the "highest management positions of the organization as well as the primary actors for the organization with respect to the conduct giving rise to this lawsuit." The court precluded plaintiff's counsel from using evidence obtained during *ex parte* interviews with defendant's former employees.

In *American Protection Insurance Co. v. MGM Grand Hotel-Las Vegas, Inc., supra,* counsel contacted the employee while he was still employed by the opposing party. p. 11, n. 11. Indeed, at the time the suit was commenced, he had been the opposing party's vice-president. Moreover, the court stressed that even if the employee had been considered a former employee, DR 7–104 would still apply because he was a "former confidential employee, a confidential consultant and a member of MGM's litigating team for this case." *Id.* Once the employee had resigned as vice president, he signed a consulting agreement that required him to assist in the litigation; he continued to work with the lawyers in preparation for litigation; and was privy to confidential information regarding the litigation. His consulting duties included such sensitive tasks as helping to draft interrogatories and assisting counsel at depositions, and in fact he was listed as an expert witness for the opposing party.

Both *Sperber* and *MGM* are easily distinguishable from the instant case. In *Sperber,* the acts of the former employees were the subject of the litigation, and in *MGM,* the former employee had an ongoing agency relationship as a consultant in the litigation. Here, defendant has presented no facts which would demonstrate that Shapiro had an ongoing agency or fiduciary relationship with Maryland Cup, or that Shapiro's acts or omissions could be imputed to Maryland Cup for purposes of its civil liability. The mere fact that Shapiro may be a prospective witness, even a critical one, does not trigger the prohibitions of DR 7–104(A)(1). *Cf. Mompoint v. Lotus Development Corp.,* 110 F.R.D. at 417.

Accordingly, the motion for an order under DR 7–104 is denied without prejudice to Maryland Cup's providing a factual basis for its conclusory assertion that Shapiro's acts or omissions can be imputed to Maryland Cup for purposes of civil liability.

### b. *Alleged Violations of the Attorney-Client Privilege.*

Maryland Cup also argues that Amarin's *ex parte* contacts with Shapiro impermissibly violated Sweetheart's attorney-client privilege. It alleges that Shapiro met and talked on several occasions with both in-house and outside counsel for Sweetheart in connection with this particular litigation; that during such conversations, the attorneys discussed their theory of the case and exchanged ideas in confidence with Shapiro on that topic; and that correspondence and draft statements back and forth between counsel and Shapiro were generated. It is undisputed that Amarin's counsel discussed at least one communication between Shapiro and counsel for Maryland Cup.

The test for determining whether the attorney-client privilege protected the communication between Shapiro and the attorney is the much-cited articulated by Judge Wyzanki in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950). He stated that the attorney-client privilege applies to protect a communication if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In some circumstances, the communications between a former employee and a corporate party's counsel may be privileged. *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 658 F.2d 1355, 1361 n. 7 (9th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982); *Porter v. Arco Metals Co.,* 642 F.Supp. 1116, 1118 (D.Mont.1986); *United States v. King,* 536 F.Supp. 253, 259 (C.D.Cal.1982). *Cf. Upjohn v. United States,* 449 U.S. 383, 403, 101 S.Ct. 677, 689, 66 L.Ed.2d 584 (1981) (Burger, C.J., concurring) ("a communication is privileged at least when, as here, an employee or former employee speaks at the direction of the management with an attorney regarding conduct ... within the scope of employment") (emphasis added). Amarin has cited no cases which hold otherwise and, in fact, has stipulated that "[c]ommunications between a retired employee and his former employer's counsel, the purpose of which are to give the former employer legal advice as to a course of action, may be privileged." Memorandum in Opposition to Defendant's Motion for a Protective Order, pg. 9.

The attorney-client privilege applies only insofar as is necessary to protect confidential communications between the client and its attorney; it will not extend to protect against the disclosure of the facts underlying such communications. *Upjohn Co. v. United States,* 449 U.S. at 395–96, 101 S.Ct. at 685–86; *see also Humphreys, Hutcheson & Moseley v. Donovan,* 755 F.2d 1211, 1219 (6th Cir.1985); *Sedco International, S.A. v. Cory,* 683 F.2d 1201, 1205 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982); *Porter v. Arco Metals Co.,* 642 F.Supp. at 1117–18. Therefore, Amarin's counsel could freely question Shapiro about the facts surrounding the agreement between the parties without implicating attorney-client privilege concerns. However, this does not end the inquiry since Shapiro's admitted disclosure to Amarin's counsel of *communications* he had with Maryland Cup's attorney raises the issue whether the privilege may have been applicable here.

Based on the record before the Court, the Court concludes that some of the communications between Shapiro and Maryland Cup's counsel were not protected by the attorney-client privilege. A review of the July 7, 1986 letter indicates that Maryland Cup's counsel interviewed Shapiro to learn about the agreement between Sweetheart and Amarin; she subsequently wrote up a summary of the interview; and Shapiro wrote a reply letter disagreeing with the way she portrayed some of the facts. Under the *United Shoe* test, no evidence before the Court indicates that this communication was a communication of facts by a client to his attorney for the purpose of securing legal services.

The Court is more concerned about the allegation that during the discussions between counsel for Maryland Cup and Shapiro, the attorneys discussed their theory of the case and exchanged ideas in confidence with Shapiro on that topic. In light of the fact that Shapiro was the former president of Sweetheart and had actively assisted counsel both in this and other litigation, Maryland Cup and its counsel could reasonably have expected that Shapiro would maintain the confidentiality of their information, trial tactics and theories. Certainly, based on the information before the Court, Shapiro is no "stranger" to whom the disclosure of these materials would be deemed a waiver of the attorney-client or work product protections.

■ If the communications between Shapiro and Maryland Cup's attorneys revealed facts which Maryland Cup's attorneys disclosed for the purpose of securing legal assistance, or if these communications disclosed legal opinions, impressions or strategies formulated by Maryland Cup's attorneys, the communications may be protected under the attorney-client privilege or work product doctrine. If Maryland Cup can demonstrate, either by a deposition transcript or other evidence, that Amarin's counsel sought in any way to cause Shapiro to divulge confidential attorney-client communications or work product to plaintiff's counsel, that conduct might

well constitute sufficiently abusive conduct to impose sanctions. *Cf. MGM supra*, at 10–11.

### CONCLUSION

Accordingly, the motion for protective order and sanctions is denied without prejudice to Maryland Cup's renewing the motion based on additional evidence.

SO ORDERED.