PUBLIC SERVICE ELECTRIC AND
GAS COMPANY, Plaintiff,

v.

ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES, LTD.
("AEGIS"), et al., Defendants.

Civ. A. No. 88–4811.

United States District Court,
D. New Jersey.

Sept. 19, 1990.

John G. McAndrews, Donna A. Fafinski, John A. Guarascio, Mendes & Mount, New York City, William J. Hanley, Ronca, McDonald & Hanley, Livingston, N.J., for London Market defendants.

William P. Skinner, Covington & Burling, Washington, D.C., Donald W. Kiel, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., Hugh J. Mahoney, Public Service Elec. & Gas Co., Newark, N.J., for Public Service Elec. and Gas Co.

James M. Altieri, Shanley & Fisher, Morristown, N.J., Barry R. Ostranger, Dennis G. Jacobs, Brad N. Friedman, John Gustafsson, Simpson, Thacher & Bartlett, New York City, for amicus curiae Travelers Indem. Co.

POLITAN, District Judge.

This case presents the important issue of to what extent Rule 4.2 of the American Bar Association Model Rules of Professional Conduct regulates a defendant's *ex parte* contacts with former employees of a plaintiff corporation. The question comes to this Court on an appeal from an Order entered on April 25, 1990 by Ronald J. Hedges, United States Magistrate. The subject Order required the defendants to

inform plaintiff, Public Service Electric And Gas Company ("PSE & G"), two days prior to initiating any *ex parte* contact with a former employee. In addition, the Order required that a warning letter be sent to the employee delineating the nature of the law suit and the purpose of the requested interview. For the reasons outlined herein, the Order of April 25, 1990 will be REVERSED.

PSE & G initiated this action for a declaratory judgment and damages against various of its insurance carriers including Associated Electric & Gas Insurance Services, Ltd. ("AEGIS"), certain EBASCO Companies, and Certain London Market Insurers ("London Market defendants").[1] The Complaint alleges that the defendants breached various excess liability insurance policies which required the insurers to indemnify PSE & G for all sums it becomes legally obligated to pay as a result of property damage claims by third parties. The underlying claims asserted against PSE & G, by the New Jersey Department of Environmental Protection ("DEP"), concern environmental contamination at thirty-five coal gasification sites owned or previously used by PSE & G throughout New Jersey. It is estimated that remedial investigation will cost $200,000 to $1,000,000 per site. The total remediation cost cannot be estimated at this point.

In January of 1990 the London Market defendants retained the services of a private investigator to locate and interview former PSE & G employees. PSE & G objected to these interviews before Magistrate Hedges on March 16, 1990. Magistrate Hedges asked the parties to brief the issue of *ex parte* contacts with former employees and argument was held on April 3. On April 25, Magistrate Hedges signed the subject Order. It provides in part:

> 4. Defendants shall not attempt to interview any former Public Service employee unless they have disclosed the name of the former employee in a list of former employees that they expect to interview submitted to Public Service at least two business days prior to initiating contact with the former employee (not counting the day on which the list is received by Public Service). Public Service shall have the right within that two day period to identify former employees on such a list who have already been spoken to by counsel for Public Service. Defendants may not contact any employees so identified by Public Service without giving additional prior notice to Public Service.

> 5. Defendants shall not interview any former Public Service employee unless they have first sent or delivered to such employee a letter in the form of Attachment A, hereto.

The warning letter identifies the sender as a private investigator employed by an insurance company. It describes the nature of the law suit and the investigator's purpose in soliciting the interview; *i.e.*, to marshall facts concerning PSE & G's activities at the subject sites. It further provides that the decision to be interviewed rests solely with the individual. Finally, the letter indicates that PSE & G is willing to provide counsel for the individual during the interview. The full text of the letter is annexed as Exhibit A.

Under the 1976 Amendments to the Magistrate Act and Local Rule 40, a Magistrate may hear and adjudicate motions that are not dispositive of the action itself. On appeal to the District Court, a Magistrate's determination will only be "set aside [if] found to be clearly erroneous or contrary to law." Local Rule 40(D)(4)(a); *Chipollone v. Liggett Group, Inc.*, 785 F.2d 1108 (3d Cir.1986).

London Market and Travelers Indemnity Company, participating as *Amicus Curiae*, suggest that the subject Order is clearly erroneous and contrary to law for a variety of reasons. First, they argue that it finds no support in law because Rule 4.2 of the American Bar Association Model Rules of Professional Conduct does not, in any way, regulate *ex parte* contacts with PSE & G's former employees. The defense character-

---

**1.** "London Market defendants" refers to certain syndicates of underwriters at Lloyd's London and certain insurance companies subscribing to policies placed primarily in the London market.

izes these individuals as "fair game" for legitimate, informal fact finding. The London defendants suggest, in the alternative, that the Rule does not apply in this declaratory judgment action where no civil liability will accrue to PSE & G. Finally, both London Market and Travelers attack the Order on policy grounds. They assert that the ethical rules are "party neutral" and should not be used to favor either party. They argue that regulating contact with former employees offends this principal by giving PSE & G preferential access to vital information and testimony. In fact, Travelers goes so far as to argue that the Order allows PSE & G to fix the witnesses' testimony to produce "filtered" truth.

■ While the Court agrees that the subject Order is erroneous, it finds it is so for different reasons than those posited by the London defendants. Specifically, the Court finds that Rule 4.2 prohibits any informal contacts with PSE & G's former employees. As such, the subject Order, which attempts to strike a Solomonic balance between two extremes, is contrary to law.

Rule 4.2 provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The Rule serves two distinct but related purposes. It preserves the integrity of the lawyer/client relationship by prohibiting contact, absent consent or legal authorization, with the represented party. *See Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1983). It also recognizes that without such a bar the professionally trained lawyer may, in many cases, be able to win, or in the extreme case, coerce, damaging concessions from the unshielded layman.

Rule 4.2 is easily applied when the litigants are individuals. This is so because it is easy to identify the represented "parties" protected by the Rule. In the context of an organization, however, it is more difficult to delineate the parameters and scope of the protected class. This difficulty arises because a corporation can only act through natural persons. The Rule, however, does not exactly define which of the natural persons should be considered represented parties. Perhaps anticipating this difficulty, the drafters provided an Official Comment which attempts to explain the Rule's application to an organization. The Court's inquiry must focus on this Comment.[2]

The Comment to Rule 4.2 provides in relevant part:

In the case of an organization, the Rule prohibits communications by a lawyer for one party concerning the matter in representation [1] with persons having a managerial responsibility on behalf of the organization, and *with any other person*, [2] whose act or omission in connection with that matter *may* be imputed to the organization for the purposes of civil or criminal liability, or [3] whose statement may constitute an admission on the part of the organization.[3]

The parameters of Sections One and Three are easily outlined. Section One, by its terms, prohibits contact with management level employees. Similarly, Section Three regulates contact with any present employee whose statements could constitute an admission. Neither section regulates contact with former low level employees. The scope of Section 2 is not so easily stated.

In *Polycast Technology Corp. v. Uniroyal*, 129 F.R.D. 621 (S.D.N.Y.1990), Magistrate James Francis carefully examined the various ethical considerations underlying the Rule and concluded that the phrase "any other person" "... was designed to cover agents whose acts are attributable to

---

**2.** The Comments "... are intended as guides to interpretation, but the text of each Rule is authoritative." A.B.A. Rules Of Professional Conduct, Scope, 1:104.

**3.** For ease of reference the parties and Court have divided the Comment into three prongs.

an organization but who may not technically be employees." *Polycast*, at 627; *See also Amarin Plastics, Inc. v. Maryland Cup Corp.*, 116 F.R.D. 36 (D.Mass.1987) (Motion for protective order denied without prejudice to movant's right to provide factual "basis for its conclusory assertion" that former employees "acts or omissions can be imputed"). More recently, the New York Court of Appeals affirmed, without analysis, an Appellate Division finding that Rule 4.2 did not apply in any context to a former employee. *Niesig v. Team I (Detrae Enterprises, Inc.)*, 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990). The Appellate Division reasoned that Rule 4.2 did not apply to former employees because the corporations' attorney "... cannot be presumed to represent *former* employees or agents...." *Niesig v. Team I (Detrae Enterprises, Inc.)*, 149 A.D.2d 94, 545 N.Y. S.2d 153, 157 (2d Dep't 1989). The Appellate Division did not address the official comment or offer any other analytical support for this conclusion.

Examining the same provision, Chief Judge Motley of the Southern District of New York, concluded that the phrase any other person "... is plainly broad enough to cover certain former employees." [4] *Sperber v. Washington Heights–West Harlem–Inwood Mental Health Counsel*, No. 82 Civ. 7428 (S.D.N.Y. Nov. 21, 1983), *vacated and withdrawn*, (December 13, 1983); *see also Chancellor v. Boeing Co.*, 678 F.Supp. 250, 253 (D.Kan.1988) ("When a former employee's acts or omissions in connection with the matter in representation may be imputed to the corporation, then he or she may be a "party".). This Court agrees with the interpretation of Judge Motley.

The phrase "any other person" is a general category that would, by its ordinary meaning, encompass certain former employees. It has been suggested that in order for this language to exist in harmony with Sections One and Three, it must be read to address certain current employees

not specifically covered in those sections. There is nothing in the text of the comment, however, which indicates that this broad category should be limited to current employees. The Court also rejects the argument that Section Two must be narrowly construed to avoid overlap with Sections One and Three. All three of the sections in the comment overlap in some respects. For example, a management level employee, addressed in Section One, would also ordinarily be an individual whose statement would constitute an admission within the context of Section Three. Such overlap does not compel a limiting interpretation. On the contrary, it suggests that the drafters used this language in an effort to encompass all possible eventualities. The Court's interpretation should reflect this caution.

The qualifying language, "whose act or omission ... may be imputed for the purpose of civil or criminal liability," determines under what circumstances contact with "any other person" is constrained by Rule 4.2. The dispositive inquiry the Court must undertake is whether, in this case, a former employee's acts or omissions could be imputed, under any factual scenario, to the organization.

█ London Market argues that a former employee's statements cannot be imputed to PSE & G, "for the purposes of civil or criminal liability", because PSE & G is a plaintiff in a declaratory judgment action. While this argument has facial appeal, it misses the mark. A declaratory judgment action is a binding adjudication of the rights and *liabilities* of the parties. The fact that no consequential relief will be awarded the prevailing party does not mean that the parties civil liabilities have not been dramatically altered. Indeed, the prevailing party in this action will be straddled with the enormous liability of funding the cleanup of the various polluted sites at issue. An adjudication of such responsibility is certainly liability within the scope of Rule 4.2.[5]

---

**4.** Although *Sperber* has been withdrawn it is still relevant as an interpretive aid.

**5.** PSE & G's Complaint also contains a distinct damage count. This action is thus not purely a

Travelers argues that the subject Order is erroneous because Rule 4.2 does not apply to contacts with a former employee. Travelers relies heavily on affidavits submitted by Professor Geoffrey Hazard, Reporter for the ABA Special Commission on the Evaluation of Professional Standards ("Kutak Commission"), and Stephen Gillers, a Professor at New York University and recognized authority in the area of legal ethics. The Court will consider the positions of each professor.

Professor Hazard suggests that the Rule and Comment do not apply to the ex-employee because they cannot bind the organization or make statements constituting admissions by the former employer. Professor Gillers similarly argues that former "agents" are free parties because they "... cannot make statements admissible against a former principal or employer under hearsay rules exceptions." The Court finds these arguments unpersuasive.

The first point that must be stressed is that there is nothing in the second prong of the Comment indicating that it is limited to situations where the witnesses' testimony would constitute an "admission." On the contrary, Section One applies to admissions whereas Section Two applies in the far broader context of any individual whose *acts* or omissions "may" be imputed to the organization. Professor Hazard's interpretation does not, in any way, clarify the intended scope of this language. It is, in fact, internally inconsistent.

For example, he writes that although the Rule "... does not address communications with *former* agents and employees ..." "it seems clear that *some* former employees ..." do fall within the Rules purview. Specifically, he notes that a former managerial level employee would be covered because he would have been privy to privileged communications and work product. *See* Hazard & Hordes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 436 (Supp.1989) ("... an opposing lawyer is not entitled to reap a harvest of such information without a valid waiver by the organization...."). According-

ing to this theory, however, the low level employee, ordinarily not exposed to such information, would properly be considered a "free" witness.

This analysis, however, finds no support in the language of Section Two which does not in any way distinguish the high level employee from the low level employee. Significantly, it also contradicts Professor Hazard's rationale for prohibiting contacts with a present low level employee. On this point, he writes that "... those who can hurt or bind the organization *with respect to the matter at hand* are off limits except for formal discovery...." To illustrate he comments:

> A typical example would be a truck driver whose involvement in an accident led to a lawsuit against his employer. The truck driver is plainly not in the control group [high level employee], yet the company and the company's lawyer have a strong interest in monitoring what he says to their opponent, because their opponent can use what he says free of the hearsay rule.

The Comment does not, however, draw amorphous distinctions between the damaging testimony caused by a present employee truck driver from the damaging testimony caused by the former employee truck driver or, in fact, the former managerial level employee. The Rule recognizes that all of these individuals can, in different ways, hurt the organization. It thus properly protects the organization's interest in the individual's acts, omissions or transactions regardless of their particular employment status.

Professor Hazard's formulation is also unpersuasive, as is Professor Gillers', because of its narrow focus on the issue of hearsay. While it is true that a former employee witness cannot testify clear of the hearsay rule on all aspects of his employment, this fact does not *ipso facto* establish that his hearsay free testimony will not be imputed to the organization. The most obvious example would be the former employee who would testify that, at the

declaratory judgment action as London Market

suggests.

direction of his superiors, he continually dumped the toxic byproduct of the Coal Gasification process into the ground. There are two prongs to this hypothetical. The first concerns whether the former employee's statements concerning his instructions would be admissible, the second the factual acts he would testify to. It is unnecessary for the Court to delve into the metaphysics of hearsay to resolve the first prong because the second aspect of the testimony, that the individual employee dumped toxic waste, would be admissible under most circumstances. That is, the employee could certainly testify to the fact that over a period of years he personally dumped toxic waste into the ground.

█ The principle that must be emphasized is that the harm caused by the imputable act is the same whether the witness is a present or former employee. The change in employment status does not effect the nature of his or her actions vis-a-vis whether they are imputable to the employer. The impact of the acts and factual testimony remains the same. The Rule, as described in the Comment, is not limited to hearsay testimony, but rather protects the organizations interest in the *acts* and *omissions*. Therefore, both the present and former employee should be considered a party represented by the corporate attorney. As such, each individual can not be the subject of informal *ex parte* investigative fact finding.[6]

This interpretation recognizes the paradox, ignored by the defense, that it is impossible to tell whether an individual's acts or omissions may be imputed until that individual has testified to those acts. It is thus unworkable to require the organization, as the Court did in *Amarin*, to make a showing concerning an individuals projected testimony prior to prohibiting *ex parte* contact with the individual. Such a procedure would, in effect, require the organization to divulge facts which would ordinarily be developed through the deposition process. The Rule would, therefore, operate to favor the party seeking *ex parte* contact. The *Amarin* Court's formulation also runs counter to the expansive Comment language. This language prohibits *ex parte* contact if there is the *possibility* of the witnesses testimony being imputed. The *Amarin* Court's approach also threatens to spawn needless litigation concerning potential witnesses unknown theoretical testimony. Such abstract motion practice would do nothing to advance the litigation to judgment on the merits.

It is similarly unworkable to allow *ex parte* contact on the condition that the investigator or attorney cease questioning if it appears that imputable information is being divulged. Such a procedure, again, threatens to spawn needless litigation concerning breaches of this undefinable restriction. It also places great ethical faith in the ability of the interviewer to cease questioning the moment the very information sought, is revealed. Moreover, even if zealously adhered to, such a restriction would merely delay the institution of the deposition process. It is more logical to hold that such individuals are off limits except for formal discovery because they "may" make statements which can be imputed.

The interpretation adopted today is also consistent with the dual policy goals of Rule 4.2. By prohibiting contact with the represented former employee, the opportunity for overreaching by the investigating party is nullified. The organization's interest in the act, omission or transaction is, therefore, also protected. Most importantly, the conclusion reached today has the decided benefit of simplicity. It thus serves the overall objective of the ethical rules by providing clear guidance to the bar concerning what conduct is prohibited and what conduct is not. This litigation, and numerous others like it, illustrate the bar's clear need for such an understanda-

---

6. Impute means "To lay the responsibility or blame for often falsely or unjustly" or "To credit to a person or a cause." *Webster's New Collegiate Dictionary* 578 (3rd ed. 1975). It is certainly likely that a jury could infer, impute or lay the blame for the witnesses' actions on the Organization. Using the language of the Rule, it is perfectly likely that such testimony "may" be imputed.

ble bright line test. Adopting an alter ego test, as delineated by the New York Court of Appeals in *Niesig*, does nothing to further this objective. Indeed, that Court's test serves only to further muddy this already clouded ethical area.

Inevitably it will be argued that the benefits derived from this clear ethical guideline do not justify the means adopted to achieve it. These arguments will focus on the extraordinary importance of the informal interview and the extraordinary hardship caused by requiring litigants to depose all former employees. The Court feels that these arguments ring the alarm bells of panic too loudly.

It is true that today's result will close off certain avenues of informal discovery and, in the process, increase the need for depositions. The cost and time of litigation may also, arguably, be increased. But there is nothing particularly onerous about this. In the context of litigation involving an organization, the importance of the informal interview is greatly exaggerated, particularly when its use threatens to produce needless and costly procedural litigation. Today's result eliminates this hydra without foreclosing litigant's access to vital factual information. Indeed, prompt use of the deposition process will ultimately produce less procedural haggling and thus may be, in the long run, more cost efficient.

It is also true that the deposition process is the best method of developing clear factual records and protecting the rights of all parties without unduly favoring or prejudicing either side. It is a far more reliable and ethically sound procedure than the informal methods espoused by the defense.

The Order of Magistrate Hedges is hereby REVERSED.

SO ORDERED.

### ATTACHMENT A

[Investigator's Letterhead]

Dear [INSERT NAME OF FORMER EMPLOYEE]:

This letter is being delivered to you pursuant to an order of a federal court. Please read the letter carefully so that you can decide whether or not you would be willing to allow me to interview you at a location of your convenience regarding your former employer, Public Service Electric and Gas Company.

I am a private investigator who has been retained by certain insurers who are defendants in a lawsuit brought by your former employer. No current or former employees of Public Service Electric and Gas Company are parties to this lawsuit, and my clients have not and will not sue any employees. The lawsuit concerns Public Service Electric and Gas Company's efforts to obtain insurance coverage for certain environmental claims that have been made by the New Jersey Department of Environmental Protection and various private parties with respect to certain sites in New Jersey that were formerly used to manufacture gas or, as in one instance, to dispose of gas plant wastes. These sites include the former Provost Street Gas Works site in Jersey City, the former Camden Coke Plant and Camden Gas Works in Camden, and a site on Memorial Drive in West Paterson which received waste from the former Paterson Gas Works in Paterson.

In connection with the lawsuit, I am attempting to gather information about the manner in which Public Service Electric and Gas Company operated these sites and handled gas plant wastes. Such information may help my clients support their position against Public Service Electric and Gas Company that there is no insurance coverage for the environmental claims that are involved in the lawsuit. For that reason, I would like to interview you about these subjects.

You have no obligation to agree to an interview. On the other hand, there is nothing that prevents you from agreeing to be interviewed. Whether or not you agree to an interview, you may be asked to give testimony in this case. If you do not wish to testify voluntarily, a subpoena may be sought to compel your testimony.

Public Service Electric and Gas Company is willing to answer any questions you may have about this request for an interview, and to provide a lawyer to be with you for the interview if you desire or in the event that you are subpoenaed to testify. You are under no obligation to contact Public Service Electric and Gas Company if you do not want to. However, if you wish to do so, you may call 1–800–628–8110, a toll free number that has been established by Public Service for your convenience.

If you are agreeable to an interview, you will be asked to sign a copy of this letter acknowledging that you have read the letter and have voluntarily agreed to be interviewed.

Very truly yours,