117 T.C. No. 24

UNITED STATES TAX COURT

SAMUEL T. SEAWRIGHT AND CAROL A. SEAWRIGHT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1796-00.                    Filed December 18, 2001.

     R's examination of Ps' tax liability commenced no
later than July 16, 1998.  After Ps petitioned this
Court to redetermine the deficiency, R's trial counsel
informally contacted potential third-party witnesses
without providing advance notice to Ps.
     1.  <u>Held</u>:  Sec. 7602(c), I.R.C., which requires
that R give the taxpayer advance notice of third-party
contacts regarding R's examination or collection
activities, is inapplicable with respect to R's
examination activities here, which all occurred before
the Jan. 19, 1999, effective date of sec. 7602(c).
     2.  <u>Held</u>, <u>further</u>, sec. 7602(c), I.R.C., is
inapplicable with respect to R's trial preparation
activities.
     3.  <u>Held</u>, <u>further</u>, sec. 7602(e), I.R.C., which
restricts R's use of financial status or economic
reality examination techniques, is inapplicable with
respect to R's examination techniques which were
employed before the July 22, 1998, effective date of
sec. 7602(e), I.R.C.
     4.  <u>Held</u>, <u>further</u>, Ps bear the burden of proof.

5.  *Held*, *further*, the allowable business expenses of Ps' salvage business determined.

6.  *Held*, *further*, the cost of goods sold of Ps' salvage business determined.


Samuel T. Seawright and Carol A. Seawright, pro sese.

James R. Rich, for respondent.


THORNTON, Judge:  Respondent determined a $6,125 deficiency in petitioners' joint 1995 Federal income tax.  The issues for decision are:  (1) Whether respondent's agents violated section 7602(c), which requires the Internal Revenue Service (IRS) to give taxpayers advance notice of certain third-party contacts; (2) whether respondent's agents violated section 7602(e), limiting respondent's use of financial status or economic reality examination techniques; (3) whether, pursuant to section 7491, respondent bears the burden of proof; (4) whether petitioners are entitled to deduct various business expenses of their salvage business in amounts greater than respondent has allowed; and (5) whether petitioners are entitled to reduce gross receipts from their salvage business by certain amounts for cost of goods sold.[1]

---

[1] All section references are to the Internal Revenue Code as in effect for the relevant taxable year, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate herein by this reference.

### Petitioners

Petitioners are married.  When they filed their petition, they resided in Columbia, South Carolina.

### Columbia North East Used Parts

Petitioner Samuel T. Seawright (Samuel) owned and operated a family business known as Columbia North East Used Parts (Columbia), located on Hardscrabble Road in Columbia, South Carolina.  Samuel was the primary laborer for Columbia, petitioner Carol Seawright (Carol) was the record-keeper, and petitioners' son, Monty Seawright (Monty), worked with Samuel at Columbia on weekends.

Columbia began operations in 1977, when Samuel paid about $2,000 for five junked cars.  Petitioners owned a 1978 Ford truck with a wrecker boom in the bed.  Samuel used the truck to pick up and haul away items such as appliances, scrap metal, and junked vehicles.  Samuel did not charge for the hauling service.

Petitioners stored the junked vehicles and other hauled-away items at their scrap yard on Hardscrabble Road.  Samuel rebuilt some of the junked vehicles to sell.  Petitioners salvaged and sold used parts from some of the junked vehicles.

In 1992, Columbia "crushed out" all its inventory of junked vehicles and other items, selling it as scrap metal. In 1993 and 1994, Samuel continued to haul various items to petitioners' scrap yard, including junked or abandoned vehicles. Petitioners did not pay for any of the items Samuel hauled away during these years. The only gross receipts generated from Columbia's business during 1993 and 1994 were attributable to some automobile body work and other labor that Samuel performed.

In 1995, Columbia recommenced rebuilding junked vehicles. Between April and December 1995, petitioners spent a total of $18,742 to purchase 14 junked vehicles (at a total cost of $17,285) and various automotive parts (at a total cost of $1,457). Petitioners bought a number of these junked vehicles at auctions conducted by Sadisco of Columbia (Sadisco), a company which operated as a middleman between insurance companies in possession of wrecked automobiles and dealers who buy them.

During 1995, Columbia rebuilt or was in the process of rebuilding at least six damaged vehicles, five of which were sold to third parties in 1996 for an aggregate sales price of $23,400.[2] As required by State law, along with the application of certificate for title/registration for each of these six vehicles, there was filed with the South Carolina Department of

---

[2] None of the rebuilt vehicles were sold in 1995. During 1995, petitioners sold none of its inventory to scrap dealers.

Revenue and Taxation, Division of Motor Vehicles (DMV) an "Owner's/Rebuilder's Affidavit", certifying, among other things, the fair market value of each rebuilt vehicle, as estimated in the National Automobile Dealers Association (NADA) Official Used Car Guide (blue book).[3] Four of these affidavits were filed in 1995. On these affidavits, Samuel certified NADA estimated fair market values for four of the rebuilt vehicles in amounts totaling $32,100.[4]

Petitioners' Federal Income Tax Returns

Carol prepared petitioners' 1994 and 1995 joint Federal income tax returns. On the Schedule C, Profit or Loss From Business (Sole Proprietorship) (Schedule C), attached to their 1994 return, petitioners reported that Columbia had $500 gross receipts and zero cost of goods, showing no opening inventory, no purchases, and no ending inventory. For 1994, petitioners reported that Columbia had a net loss of $3,486.

On the Schedule C attached to their 1995 return, petitioners reported that Columbia had $20,852 in gross receipts, cost of

---

[3] Petitioners did not have a car dealer's license. In order to sell the six rebuilt vehicles, Columbia North East Used Parts (Columbia) first transferred title to petitioners' son, Monty Seawright (Monty), for no consideration. Monty then made application for certificates of title/registration with the South Carolina Department of Revenue and Taxation, Division of Motor Vehicles (DMV).

[4] The two remaining affidavits were filed in March and April 1996. On these affidavits, Samuel certified fair market values of the other two rebuilt vehicles totaling $9,925.

goods sold of $18,742, and business expenses totaling $10,996, resulting in a net loss of $8,886. In computing cost of goods sold, petitioners reported $1,500 opening inventory, $18,742 purchases, and $1,500 ending inventory.

Respondent's Examination and Determinations

On July 16, 1998, Carol had her first meeting with respondent's examining agent, Susan Leary (Leary), regarding petitioners' 1995 Federal income tax return. At this initial meeting, Leary asked Carol a number of routine background questions, including but not limited to questions about petitioners' ages and education levels, and about their savings and investments. Leary also requested sales records relating to Columbia. At the initial meeting, Carol gave Leary no indication where the sales records might be.

Carol and Leary met on two subsequent occasions in August 1998. At the subsequent meetings, Carol informed Leary that the Columbia sales records had been lost.

By notice of deficiency dated January 6, 2000, respondent determined a $6,125 deficiency in petitioners' 1995 Federal income tax. As part of this determination, respondent reduced petitioners' claimed Schedule C expenses by $7,212, as follows:

| Expense item | Amount claimed on return | Amount allowed | Adjustment |
|---|---|---|---|
| Car & truck | -- | $467 | $(467) |
| Depreciation | -- | 856 | (856) |
| Employee benefit program | $1,106 | -- | 1,106 |
| Insurance | 844 | -- | 844 |
| Office expenses | 514 | 154 | 361 |
| Other rent | 2,781 | -- | 2,781 |
| Supplies | 2,450 | -- | 2,450 |
| Taxes & licenses | 1,776 | 1,024 | 751 |
| Mortgage | 879 | 879 | - |
| Utilities | 646 | 404 | 242 |
| Totals | $10,996 | $3,784 | $7,212 |

Respondent also disallowed petitioners' claimed cost of goods sold in its entirety on the grounds that petitioners had failed to substantiate the amount of purchases and had failed to establish the value of Columbia's opening and closing inventories for taxable year 1995.  Respondent made no adjustment to the amount of Columbia's 1995 gross receipts as reported by petitioners.

On February 15, 2000, petitioners filed their petition with this Court.  On March 27, 2000, respondent filed his answer, requesting that his determination as set forth in the notice of deficiency be in all respects approved.  On October 2, 2000, the trial was held in Columbia, South Carolina.

OPINION

Third-Party Contacts

Petitioners contend that respondent's agents violated section 7602(c) by contacting third parties without giving petitioners proper advance notice.  Respondent contends that section 7602(c) has no application to this case.

Section 7602(c), which was added by section 3417 of the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, 112 Stat. 757, provides as follows:

(c) Notice of Contact of Third Parties.--

(1) General notice.--An officer or employee of the Internal Revenue Service may not contact any person other than the taxpayer with respect to the determination or collection of the tax liability of such taxpayer without providing reasonable notice in advance to the taxpayer that contacts with persons other than the taxpayer may be made.

(2) Notice of specific contacts.--The Secretary shall periodically provide to a taxpayer a record of persons contacted during such period by the Secretary with respect to the determination or collection of the tax liability of such taxpayer.  Such record shall also be provided upon request of the taxpayer.

(3) Exceptions.--This subsection shall not apply--

(A) to any contact which the taxpayer has authorized;

(B) if the Secretary determines for good cause shown that such notice would jeopardize collection of any tax or such notice may involve reprisal against any person; or

(C) with respect to any pending criminal investigation.

Section 7602(c) is effective for contacts made after the 180th day after the July 22, 1998, enactment of RRA 1998 (i.e., after January 18, 1999). See RRA 1998 sec. 3417(b), 112 Stat. 758.

### Alleged Third-Party Contacts During the Examination

On brief, petitioners allege that during the initial July 16, 1998, meeting, Leary told Carol that she had previously contacted petitioners' bank and that Leary subsequently asked Carol why petitioners changed banks so often. Petitioners allege that this line of inquiry "shows that she [Leary] had extensive third party contacts". Petitioners allege that they told Leary that they wanted to be notified whenever a third party was contacted, but they never received any third-party contact information from the Internal Revenue Service (IRS).

Section 7602(c) has no application to any third-party contacts that might have been made by respondent's agents before the January 19, 1999, effective date. The evidence does not show that Leary or any other of respondent's agents made any third-party contacts after January 18, 1999, in the course of the examination that culminated in the January 6, 2000, issuance of the notice of deficiency.

### Alleged Third-Party Contacts During Trial Preparation

On brief, petitioners allege that shortly before the October 2000 trial date, respondent's agents contacted various third

parties, including representatives of Sadisco, the Department of Motor Vehicles (DMV), and certain purchasers of petitioners' rebuilt vehicles.

On reply brief, respondent concedes that in the course of preparing for trial, respondent's trial counsel contacted potential witnesses without advance notice to petitioners. Respondent contends that these contacts did not violate section 7602(c). We agree with respondent.

Section 7602(c) restricts the IRS's third-party contacts "with respect to the determination or collection of the tax liability". The statute does not expressly indicate whether the IRS's trial preparations in the course of a court proceeding should be considered to be "with respect to the determination or collection of the tax liability".

The proposed regulations state that "Section 7602(c) does not apply to contacts made in the course of a pending court proceeding." Section 301.7602-2(f)(7), Proposed Proced. & Admin. Regs., 66 Fed. Reg. 84 (Jan. 2, 2001). Proposed regulations are given no greater weight than a position advanced by respondent on brief. See F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970). Nevertheless, they can be useful guidelines where, as here, they closely follow the legislative history of the statutory provision in question. See Van Wyk v. Commissioner, 113 T.C. 440, 444 (1999).

The pertinent legislative history states that the purpose of section 7602(c) is to require "the IRS to notify the taxpayer before contacting third parties regarding <u>examination</u> or <u>collection</u> activities (including summonses) with respect to the taxpayer." S. Rept. 105-174, at 77 (1998), 1998-3 C.B. 537, 613 (emphasis added). Accordingly, we conclude that Congress did not intend section 7602(c) to apply to third-party contacts made by the IRS in the course of trial preparation activities, where those contacts are not with respect to examination or collection activities.[5]

This interpretation is consistent with the general statutory scheme, which distinguishes between the litigation of tax liabilities, see chapter 76 (captioned "Judicial Proceedings"),

---

[5] We are mindful that under sec. 6212(c), the Internal Revenue Service (IRS), may, in certain circumstances, determine an additional deficiency after the taxpayer files a timely petition with the Tax Court, and that in the course of making such further determination, the IRS is not barred from exercising its examination authority under sec. 7602(a). See United States v. Gimbel, 782 F.2d 89, 93 (7th Cir. 1986) (pending Tax Court proceedings did not bar IRS from invoking summons authority, rather than using Tax Court discovery procedures, in seeking the taxpayers' financial records, where the taxpayers' liability was still subject to redetermination pursuant to sec. 6212(c)); Bolich v. Rubel, 67 F.2d 894, 895 (2d Cir. 1933 )("Since the Commissioner may apply to the Board [of Tax Appeals] to increase the assessment [in the notice of deficiency], he may need to prepare his case in advance by a further examination, which is quite another matter from producing evidence in support of it."). The instant case does not present, and we do not reach, the issue of the extent to which the restrictions of sec. 7602(c) might apply with respect to examinations conducted by the IRS to determine an additional deficiency pursuant to sec. 6212(c) during the pendency of a Tax Court proceeding.

and the IRS's examination and enforcement activities, see chapter

78 (captioned "Discovery of Liability and Enforcement of Title").

Section 7602 (captioned "Examination of books and witnesses")

appears in subchapter A (captioned "Examination and Inspection")

of chapter 78.  Section 7602(a) contains a very broad grant of

authority to the IRS to examine books and records, issue summons,

and take testimony under oath for the purpose, inter alia, of

determining or collecting the Federal tax liability of any

person.  Section 7602(c) is drafted as a restriction on the

section 7602(a) examination authority.  The authority of the

IRS's trial counsel to informally interview prospective third-

party witnesses to gather evidence in preparation for trial does

not emanate from section 7602(a).[6]  Consequently, section 7602(c)

_____

[6] The authority of the IRS's trial counsel to conduct trial preparation inheres in section 7452, which provides that the Secretary shall be represented before the Tax Court by the Chief Counsel of the IRS or his delegate.  The exercise of this authority is subject to the Tax Court's Rules of Practice and Procedure.  See sec. 7453 (with exceptions not relevant here, proceedings before the Tax Court shall be conducted in accordance with such rules of practice and procedure as this Court may prescribe).

The Tax Court has not prescribed rules specifically relating to informal pretrial interviews of potential witnesses.  Cf. Fu Inv. Co. v. Commissioner, 104 T.C. 408, 410 (1995) ("Arguably, respondent's efforts to arrange informal witness interviews do not fall within our discovery procedures, and, thus, are not subject to restriction under Rule 103"), citing Amarin Plastics, Inc. v. Md. Cup Corp., 116 F.R.D. 36, 38 (D. Mass. 1987) (interpreting Fed. R. Civ. P. 26(c)).  Pursuant to this Court's standing pretrial order, however, respondent was required to identify witnesses in his trial memorandum, which was required to
(continued...)

does not restrict that authority.

As far as the record reveals, respondent's examination activities ceased no later than January 6, 2000, when respondent issued the notice of deficiency. Respondent has not sought to use the section 7602(a) examination power to determine any additional deficiency, pursuant to section 6212(c). There is no evidence that respondent used the section 7602(a) examination power to summon prospective third-party witnesses and take testimony under oath. Cf. Westreco, Inc. v. Commissioner, T.C. Memo. 1990-501, modified in Ash v. Commissioner, 96 T.C. 459 (1991). There is no evidence to suggest that respondent's agents made any third-party contacts in connection with any collection activity.[7]

We conclude that the informal contacts of potential witnesses by respondent's trial counsel in preparation for trial were not made in the course of respondent's examination or collection activities and therefore are not subject to the restrictions of section 7602(c).

---

[6](...continued)
be submitted to the Court and to petitioners at least 15 days before the trial session. Respondent complied with these requirements of the standing pretrial order.

[7] As a general matter, if the taxpayer has filed a petition with this Court for a redetermination of the deficiency, the IRS may not commence collection activities until this Court's decision has become final. Sec. 6213(a).

Conclusion

Petitioners have not shown that respondent's agents violated section 7602(c).

Statutory Limitation on Financial Status Audits

Citing various background questions that Leary asked Carol at their initial meeting on July 16, 1998, petitioners contend that on or about that date respondent used a financial status or economic reality examination technique in violation of section 7602(e).[8]

Section 7602(e) became effective on the date of enactment of RRA 1998; i.e., July 22, 1998.  H. Conf. Rept. 105-599, at 270 (1998), 1998-3 C.B. 755, 1024.  Petitioners do not contend that any actions taken by respondent's agents on or after July 22, 1998, violated section 7602(e).  Accordingly, section 7602(e) has no application to this case.

Burden of Proof

Petitioners contend that respondent bears the burden of proof pursuant to section 7491.  Respondent contends that section 7491 is inapplicable.  We agree with respondent.

---

[8] Sec. 7602(e), as added by Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3412, 112 Stat. 751, provides:

> (e) Limitation on Examination of Unreported Income.--The Secretary shall not use financial status or economic reality examination techniques to determine the existence of unreported income of any taxpayer unless the Secretary has a reasonable indication that there is a likelihood of such unreported income.

Under Rule 142, the burden of proof is upon the petitioner, except as otherwise provided by statute. In certain circumstances, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, section 7491 places the burden of proof on respondent. Sec. 7491(a); Rule 142(a)(2). Section 7491 is effective with respect to court proceedings arising in connection with examinations commencing after July 22, 1998. RRA 1998 sec. 3001(c)(2), 112 Stat. 726.

The undisputed facts indicate that respondent's examination of petitioners' 1995 Federal income tax return commenced before July 23, 1998. Accordingly, section 7491 has no application to this case. Petitioners bear the burden of proof. Rule 142(a).

Petitioners' Trade or Business Expenses

The parties disagree about petitioners' entitlement to deduct, pursuant to section 162, various trade or business expenses.

Vehicle Expenses

On their 1995 return, petitioners claimed no deduction for vehicle expenses. In the notice of deficiency, respondent allowed petitioners a deduction of $467. Petitioners have not established that they are entitled to a vehicle expense deduction greater than respondent has allowed.

### Depreciation

On their 1995 return, petitioners claimed no depreciation deduction. In the notice of deficiency, respondent allowed petitioners a depreciation deduction of $856. Petitioners have not established that they are entitled to a depreciation deduction greater than respondent has allowed.

### Employee Benefit Programs

On brief, petitioners concede that they are not entitled to any deduction for "Employee benefit programs" as claimed on their 1995 Schedule C.

### Insurance

On their 1995 return, petitioners claimed an $844 deduction for business insurance expense, all of which respondent disallowed. On the basis of our detailed review of the record, we find that petitioners are entitled to a deduction of $262 for insurance expense.

### Office Expenses

On their 1995 return, petitioners claimed a $514 deduction for office expenses. In the notice of deficiency, respondent allowed $154. On the basis of our detailed review of the record, we find that petitioners are entitled to a deduction of $319 for office expenses.

### Other Rent

On their 1995 return, petitioners claimed a $2,781 deduction for "Other rent", all of which respondent disallowed.

Petitioners have not established that they are entitled to any deduction for "Other rent".

Supplies

On their 1995 return, petitioners claimed a $2,450 deduction for supplies, all of which respondent disallowed in the notice of deficiency. On brief, respondent concedes that petitioners incurred $2,450 in expenses for materials used to rebuild vehicles but contends that this amount should be added to purchases in computing petitioners' cost of goods sold, rather than deducted as a current expense. We agree with respondent.

The evidence in the record indicates that the claimed supplies expenses relate to petitioners' rebuilding junked automobiles for sale and that these expenses represented either raw materials or supplies entering into the rebuilt automobiles or direct labor relating thereto. These amounts are includable in the cost of petitioners' rebuilt automobiles, see sec. 1.471-3(c), Income Tax Regs., and thus are not deductible as trade or business expenses pursuant to section 162(a) but rather enter into the calculation of petitioners' cost of goods sold in determining their gross income, see Beatty v. Commissioner, 106 T.C. 268, 273 (1996).

Small Tools

Petitioners contend that they are entitled to a $281 deduction for small tools. While small tools with a useful life

of less than 1 year are currently deductible, <u>Clemons v. Commissioner</u>, T.C. Memo. 1979-273, the cost of tools with a useful life that exceeds 1 year are recovered by depreciation, secs. 167(a) and 168(b).

Petitioners offered no evidence about the type, expected useful life, or cost of each tool acquired.  Consequently, we have no basis for determining which costs might be currently deductible or for estimating appropriate depreciation deductions for tools with useful lives greater than 1 year.

### Taxes and Licenses

On their 1995 return, petitioners claimed a $1,776 deduction for taxes and licenses.  In the notice of deficiency, respondent allowed $1,024.  On the basis of our detailed review of the record, we find that petitioners are entitled to a deduction of $1,105 for taxes and licenses.

### Utilities

On their 1995 return, petitioners claimed a $646 deduction for utilities.  In the notice of deficiency, respondent allowed $404.  Petitioners have not established that they are entitled to a deduction for utilities expenses greater than respondent has allowed.

### Cat Food

On brief, respondent concedes that petitioners are entitled to a $300 business expense deduction for cat food that

petitioners purchased and set out in their scrap yard for the purpose of attracting wild cats to deter snakes and rats.

Cost of Goods Sold

Petitioners contend that in 1995 Columbia had cost of goods sold of $18,742, computed as follows:

| | |
|---|---|
| Opening Inventory | $1,500 |
| Add: Purchases | 18,742 |
| Less: Closing Inventory | 1,500 |
| Cost of Goods Sold | $18,742 |

On brief, respondent concedes that petitioners have substantiated purchases in the amount of $18,742 but contends that petitioners have not established the value of their opening or ending inventory, and thus are not entitled to reduce Columbia's gross receipts for cost of goods sold. We agree with respondent.

In a manufacturing, merchandising, or mining business, gross income means total sales less the cost of goods sold. Sec. 1.61-3(a), Income Tax. Regs. Cost of goods sold is computed by subtracting the value of ending inventory (goods still on hand at the end of the year) from the sum of the opening inventory and purchases during the year. Primo Pants Co. v. Commissioner, 78 T.C. 705, 723 (1982).

On their 1995 Federal income tax return, petitioners claimed to have used the lower of cost or market as the basis for valuing their inventory. Under this approach, "the market value of each

article on hand at the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article." Sec. 1.471-4(c), Income Tax Regs.[9]

In 1992, Columbia disposed of all its then-existing inventory. Although they subsequently acquired additional items of inventory, petitioners incurred no direct cost (and have established no indirect costs) for the items acquired, prior to their purchase of some junked vehicles in April 1995. Consequently, Columbia's opening inventory for 1995 had a cost of zero, which is consistent with petitioners' reporting of a zero ending inventory for 1994. See Steel or Bronze Piston Ring Corp. v. Commissioner, 13 T.C. 636 (1949) ("consistency requires that the opening inventory of each year correspond to the closing inventory of the preceding year").

---

[9] The Supreme Court has summarized the lower of cost or market approach as follows:

> The taxpayer must value inventory for tax purposes at cost unless the 'market' is lower. 'Market' is defined as 'replacement cost,' and the taxpayer is permitted to depart from replacement cost only in specified situations. When it makes any such departure, the taxpayer must substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations. In the absence of objective evidence of this kind, a taxpayer's assertions as to the 'market value' of its inventory are not cognizable in computing its income tax. [Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 535 (1979).]

Columbia's ending inventory for 1995 consisted of whatever no-cost items remained from its 1995 opening inventory, plus the items purchased for $18,742 (including 14 junked vehicles) plus the $2,450 expended on supplies (as previously discussed). Thus, Columbia's ending inventory had a cost of $21,192.

Petitioners contend that the market value of Columbia's 1995 ending inventory was only $1,500, which they argue was the scrap value of the 1995 ending inventory. Petitioners have failed to substantiate their claimed market value "by providing evidence of actual offerings, actual sales, or actual contract cancellations." Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 535 (1979). In any event, petitioners' contention is contradicted by Samuel's admissions in the Owner's/Rebuilder's Affidavits filed with the DMV in 1995, certifying that the NADA estimated fair market values of just four of the rebuilt automobiles in Columbia's inventory totaled $32,100.[10] Petitioners' contention is further undermined by evidence showing that these four rebuilt automobiles, along with another vehicle

---

[10] Although Columbia transferred title to the rebuilt vehicles to Monty for no consideration before the vehicles were sold to third parties, Samuel testified that the transfers to Monty were not gifts, stating: "The fact is that these vehicles were put in his [Monty's] name in order to sell it [sic]. All of them were reported as income through our business." Consequently, we ignore petitioners' transfers of the rebuilt automobiles to Monty.

contained in Columbia's 1995 ending inventory, were sold to third parties in 1996 for $23,400.

In sum, petitioners have failed to show that the market value of Columbia's 1995 ending inventory was less than its $21,192 cost.

We conclude and hold that Columbia's 1995 cost of goods sold was zero, computed as $0 (opening inventory) plus $21,192 (purchases) minus $21,192 (ending inventory).  Accordingly, respondent's determination on this issue is sustained.

All other contentions raised by the parties are irrelevant, without merit, or moot.

To reflect the foregoing and concessions of the parties,

Decision will be entered

Under Rule 155.