T.C. Memo. 2012-132

UNITED STATES TAX COURT

STANLEY PATRICK ZURN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19724-03.                          Filed May 10, 2012.

<u>Richard J. Radcliffe</u>, for petitioner.

<u>Donna L. Crosby</u>, for respondent.

MEMORANDUM OPINION

GALE, <u>Judge</u>:  In a notice of deficiency respondent determined the following

deficiencies, additions to tax, and accuracy-related penalties with respect to

petitioner's Federal income taxes:

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662 |
|------|-----------|----------------------------------|-------------------|
| 1991 | $142,519 | $35,492.25 | $28,503.80 |
| 1992 | 158,218 | 39,304.50 | 31,643.60 |
| 1993 | 98 | --- | --- |
| 1994 | 3,798 | 637.00 | 759.60 |

Unless otherwise noted, all section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are: (1) whether the notice of deficiency is time barred, an issue petitioner raises for the first time on brief; (2) whether property transactions that petitioner entered into in 1991 and 1992 qualify for like-kind exchange treatment pursuant to section 1031; (3) whether petitioner is liable for additions to tax under section 6651(a) for 1991, 1992, and 1994; and (4) whether petitioner is liable for accuracy-related penalties under section 6662(a) for 1991, 1992, and 1994.

---

[1]Petitioner concedes that he is not entitled to net operating loss carryovers claimed of $43,028, $354,937, $252,822, and $227,754 for 1991, 1992, 1993, and 1994, respectively. Petitioner further concedes that he had $6,359 of unreported interest income for 1991.

## Background

After an evidentiary hearing regarding the admissibility of an exhibit he proffered,[2] petitioner informed the Court that he did not intend to call any witnesses or to testify at trial. Respondent thereupon agreed not to call witnesses, and the parties submitted this case fully stipulated pursuant to Rule 122.[3] Accordingly, our findings of fact are based on the parties' stipulation of facts and the attached exhibits, and are, given the circumstances, somewhat sketchy and incomplete.

At the time he filed the petition, petitioner resided in California.

Examination for the years at issue commenced on December 30, 1997, at which time petitioner had not filed a return or obtained an extension of the filing deadline for any of the years. Petitioner thereafter filed a return for each year in issue in July through October 1998.

---

[2]The exhibit, an affidavit with attachments, was held inadmissible.

[3]Within the stipulation respondent reserved objections on the ground of relevance to petitioner's proffered Exhibits 31-P, 32-P, 33-P, 34-P, and 35-P. We conclude that the exhibits have some modest relevance and therefore admit them.

Petitioner reserved an objection to respondent's proffered Exhibit 36-R on the ground of relevance. Exhibit 36-R is a copy of a December 30, 1997, letter from Revenue Agent Hyung Lee informing petitioner that his 1991, 1992, 1993, 1994, and 1995 tax returns were under examination. Respondent argues this exhibit is relevant to establish when the examination of the tax years in issue commenced. We concur; petitioner's objection is overruled.

Before and during the taxable years in issue petitioner owned numerous residential rental properties in the Los Angeles area, three of which are relevant to this case: (1) 1933 Third Avenue (Third Avenue property); (2) 3932-3934 Montclair Street (Montclair property); and (3) 1318 North Las Palmas Avenue (Las Palmas property).

Third Avenue Property

Petitioner transferred the Third Avenue property to Arthur Peck in October 1991. Petitioner subsequently entered into a "Land Exchange Agreement" dated November 26, 1991, with CLTC Exchange Co. (CLTC). The Land Exchange Agreement provided that petitioner would pay a $1,000 fee to CLTC when he conveyed the Third Avenue property to it, and in return CLTC would act as his intermediary to facilitate a section 1031 exchange of that property for another property to be identified by him. Mr. Peck thereupon on November 27, 1991, executed a $115,000 promissory note in favor of CLTC that was secured by a deed of trust on the Third Avenue property, recorded on December 11, 1991. Also on December 11, 1991, All American Escrow Corp. prepared an escrow statement for

CLTC with respect to the closing of the sale of the Third Avenue property to Arthur Peck for "total consideration"[4] of $550,000.

The escrow statement indicates that in addition to the promissory note, the balance of the consideration (offset by a "buyer's credit" of $110,000) was apparently paid in cash. Petitioner bore all closing costs for the transaction. After the buyer's credit, closing costs, taxes, title insurance, escrow charges, realtor's commission, CLTC fee, miscellaneous charges, and payoff of existing mortgage indebtedness, the statement showed a balance due to CLTC (for petitioner's exchange account) of $201,855.69. On December 19, 1991, CLTC sent petitioner a letter advising him that escrow had closed on the Third Avenue property on December 11, 1991, and that, pursuant to section 1031, he had 45 days from the date of closing to identify an exchange property to be acquired. By letter dated December 31, 1991, CLTC advised petitioner that interest earned on the balance in his exchange account had increased the total in the account to $202,052.29.

---

[4]The escrow statement indicates that the buyer of the Third Avenue property was given a $110,000 "buyer's credit". The nature or purpose of this credit is not disclosed in the record, but it casts some doubt that the consideration paid for the Third Avenue property was in fact $550,000.

On January 21, 1992, petitioner executed a "Contract For Sale of Mineral Rights" (Third Avenue mineral contract[5]) with U.S./H.N.C., Limited, Inc. (HNC). The Third Avenue mineral contract provided that petitioner agreed to purchase 25% of the oil and mineral rights of an oil and gas property known as the Rankin Unit for $551,000 and a 25% interest in the equipment contained in or on the Rankin Unit for $15,000. According to the representations HNC made in the Third Avenue mineral contract, HNC purchased Rankin Field (on which various Rankin Unit wells were located) sometime after May 1990 for a biological oil stimulation experiment-- apparently an experimental means of recovering oil from wells experiencing declines in production. According to HNC's representations, Rankin Field comprised a number of wells, referred to as Rankin Units.

The Third Avenue mineral contract provided that petitioner "hereby pays" HNC a deposit of $202,000 (the approximate balance in his CLTC exchange account) for the 25% interest, with the balance of the purchase price being due and payable on December 31, 1992, or otherwise to be paid through the profits of the Rankin Unit disbursed to him. The Third Avenue mineral contract also contained a buyback provision; HNC agreed to buy back petitioner's 25% interest in the Rankin

---

[5]For convenience, we use the term "contract" to describe the document executed by petitioner and HNC. No implication is intended concerning whether the parties effected an enforceable agreement between themselves.

Unit for $450,000 at the end of 18 months from the contract date if petitioner spent "considerable funds to develop the field under HNC directions and has been unable to increase its production."

On a date not disclosed by the record, petitioner, HNC, and CLTC executed a substitution agreement (Third Avenue substitution) whereby CLTC was substituted for petitioner under the Third Avenue mineral contract with respect to the oil and mineral rights of the Rankin Unit but not the equipment interest. The Third Avenue substitution provided that CLTC was obligated, upon receipt of instructions executed by all parties to the agreement, to deliver to HNC the following: (1) a wire transfer of $202,321.21; (2) the originals of the $115,000 promissory note and the deed of trust securing it given to CLTC by the purchaser of the Third Avenue property; (3) an assignment of the foregoing deed of trust in favor of HNC; and (4) a fire/hazard insurance policy on the Third Avenue property.[6] In turn, HNC was obligated to deliver directly to petitioner an executed "Assignment, Bill of Sale and Conveyance" of the 25% interest in the Rankin Unit as identified in the Third Avenue mineral contract.

---

[6]The record contains an undated addendum to the Third Avenue substitution which provided that "the balance of the purchase price [of the 25% interest in the Rankin Unit] in excess of the exchange credit of $202,321.21, shall be the sole responsibility of * * * [petitioner] and * * * [HNC] shall look only to * * * [petitioner] for performance of all obligations thereunder."

The record contains two typewritten documents wherein petitioner (not CLTC) authorizes a bank wire of $202,321.21 to HNC, one dated January 18, 1992, and the other dated February 24, 1992. HNC executed an "Assignment, Bill of Sale and Conveyance" of a 25% interest in the Rankin Unit to petitioner, effective January 21, 1992.[7] On January 28, 1992, CLTC executed an assignment to HNC of Arthur Peck's original $115,000 note and the deed of trust securing it.[8] There is no evidence that petitioner ever paid the balance of the $566,000 purchase price due under the Third Avenue mineral contract for the 25% interest in the Rankin Unit.

Montclair Property

Petitioner transferred the Montclair property to Elizabeth Pilate in February 1992. Ms. Pilate executed a $98,000 promissory note in favor of CLTC on February 20, 1992, secured by a deed of trust on the Montclair property that was recorded on February 26, 1992. On February 27, 1992, All American Escrow Corp.

---

[7]There is no evidence in the record that this document was ever recorded.

[8]There is no evidence in the record that this document was ever recorded.

prepared an escrow statement for CLTC[9] with respect to the closing of the sale of the Montclair property to Ms. Pilate for "total consideration"[10] of $410,000.

The escrow statement indicates that in addition to the promissory note, the balance of the consideration (offset by a "buyer's credit" of $110,000) was apparently paid in cash. Petitioner bore all closing costs. After the buyer's credit, closing costs, taxes, title insurance, escrow charges, realtor's commission, CLTC's fee, miscellaneous charges, and payoff of existing mortgage indebtedness, the statement showed a balance due to CLTC (for petitioner's exchange account) of $106,955.94.

On February 20, 1992--the same day that the buyer of the Montclair property executed a promissory note and before the closing of the Montclair transaction-- petitioner executed a second "Contract For Sale of Mineral Rights" (Montclair mineral contract) with HNC. Like the Third Avenue mineral contract, the Montclair mineral contract provided that petitioner agreed to purchase 25% of the oil and

---

[9]In context, the escrow statement clearly establishes that CLTC was performing a role in the Montclair transaction comparable to the role it assumed in the Third Avenue transaction. However, the record does not contain a "Land Exchange Agreement" or comparable instrument delineating the rights and obligations of petitioner and CLTC in connection with the transfer of Montclair.

[10]As with the Third Avenue transaction, the escrow statement for the Montclair transaction indicates that the buyer of Montclair was given a $110,000 "credit". The nature or purpose of this "credit" is not disclosed in the record, but it casts some doubt that the consideration paid for Montclair was in fact $410,000.

mineral rights of the Rankin Unit and was identical in all material respects to the Third Avenue mineral contract except for (1) the execution date; (2) the purchase price of the 25% share of the oil and mineral rights ($412,000 instead of $551,000); and (3) the absence of HNC's repurchase obligation.

The Montclair mineral contract likewise provided that petitioner "hereby pays" a deposit of $106,955.44 (the approximate balance in his CLTC exchange account) for the 25% interest, with the balance of the purchase price being due and payable on December 31, 1992, or otherwise to be paid through the profits of the Rankin Unit disbursed to petitioner.

On February 28, 1992, petitioner and HNC executed a substitution agreement (Montclair substitution) whereby CLTC was substituted for petitioner under the Montclair mineral contract with respect to the oil and gas mineral rights of the Rankin Unit but not the equipment interest. Although CLTC was listed as a party to the document, no one signed on its behalf. The Montclair substitution provided that CLTC was responsible, upon receipt of instructions executed by all parties to the agreement, for delivering to HNC the following: (1) a check payable to HNC for $106,955.94; (2) the originals of the $98,000 note and deed of trust securing it given to CLTC; and (3) an assignment of the foregoing deed of trust in

favor of HNC.[11]  In turn, HNC was obligated to deliver directly to petitioner an executed "Assignment, Bill of Sale and Conveyance" of the 25% interest in the Rankin Unit as described in the second contract.

There is no evidence that either petitioner or CLTC made the $106,955.64 payment to HNC contemplated in the Montclair mineral contract and the Montclair substitution.  However, HNC executed an "Assignment, Bill of Sale and Conveyance" of a 25% interest in the Rankin Unit to petitioner, effective February 24, 1992.[12]  Over a month later, on April 3, 1992,  CLTC executed an assignment to HNC of the original of the $98,000 note and the deed of trust securing it given by the purchaser of the Montclair property.[13]  There is no evidence that petitioner ever paid the balance of the $427,000 purchase price due under the Montclair mineral contract for a 25% interest in the Rankin Unit.

---

[11]The Montclair substitution also contained a provision comparable to that included in the addendum to the Third Avenue substitution; namely, that the balance of the purchase price of the 25% interest in the Rankin Unit in excess of the exchange credit of $106,955.44 would be the sole responsibility of petitioner.

[12]There is no evidence in the record that this document was ever recorded.

[13]There is no evidence in the record that this document was ever recorded.

Las Palmas Property

Petitioner transferred the Las Palmas property to Michael and Lynn Weeks and Curtis Abish in June 1992. On June 12, 1992, petitioner and CLTC entered into a "Land Exchange Agreement" under which CLTC agreed to act as an intermediary for him to facilitate a section 1031 exchange of the Las Palmas property for another property to be identified by him. The agreement provided that CLTC's fee for the duties assumed in the agreement was $1,000 "to be paid by * * * [petitioner] upon conveyance of * * * [the Las Palmas property] to CLTC."

On June 16, 1992, petitioner executed a "Contract for Sale of Mineral Rights" (Las Palmas mineral contract) with HNC. The Las Palmas mineral contract was identical in most respects to the Third Avenue and Montclair mineral contracts, although the subject property was the oil and mineral rights of the "Vicksburg Zone" of the Rankin Unit, the purchase price was $415,000, and there was no buyback obligation on HNC's part. As with the other two mineral contracts with HNC, petitioner was obligated to pay a deposit upon contract execution (in this case, $30,000) with the balance of the purchase price being due on December 31, 1992, or otherwise to be paid through the "twenty-five (25%) of the profits from the Rankin Unit which are disbursed to * * * [petitioner]." Petitioner's share

of the "Vicksburg Zone" under the Las Palmas mineral contract, however, was not limited to 25%.

On June 26, 1992, the Wilshire Escrow Co. prepared a seller's closing statement with respect to the Las Palmas property, indicating that the consideration paid for the property was $410,000 and that after payment of closing costs, escrow fees, title insurance, taxes, the outstanding balance on existing mortgage indebtedness, and miscellaneous charges, the amount due to petitioner was $50,979.48. Unlike the escrow statements for the other two properties, the Las Palmas closing statement contained no entry indicating payment of CLTC's fee from the sale proceeds and there is no other evidence that this fee was ever paid. Also on June 26, a deed of trust on the Las Palmas property (with petitioner as beneficiary) was recorded, securing the payment of a $64,000 promissory note to petitioner from the purchasers of the Las Palmas property.

On June 30, 1992, petitioner, HNC, and CLTC executed a substitution agreement (Las Palmas substitution) whereby CLTC was substituted for petitioner under the Las Palmas mineral contract with respect to the oil and gas mineral rights of the "Vicksburg Zone" of the Rankin Unit but not the equipment interest. The Las Palmas substitution provided that CLTC was responsible, upon receipt of instructions executed by all parties to the agreement, to deliver to HNC (1) a check

for $50,000; (2) the originals of the $64,000 promissory note and deed of trust securing it given to petitioner by the purchasers of the Las Palmas property; and (3) an assignment of the foregoing deed of trust in favor of HNC. In turn, HNC was obligated to deliver directly to petitioner an executed "Assignment, Bill of Sale and Conveyance" of the Vicksburg Zone of the Rankin Unit as described in the Las Palmas mineral contract.

There is no evidence that CLTC or petitioner paid $50,000 to HNC on or after June 30, 1992, that the originals of the promissory note and deed of trust referenced in the Las Palmas substitution were turned over to HNC, or that the deed of trust was assigned to HNC. There is also no evidence that HNC executed and delivered to petitioner an "Assignment, Bill of Sale and Conveyance" of the Vicksburg Zone of the Rankin Unit or any other instrument purporting to make such a conveyance.

Reporting of the Transactions and Notice of Deficiency

On December 30, 1997, an internal revenue agent sent petitioner a letter advising him that his Federal income tax returns for 1991, 1992, 1993, and 1994

had been assigned to the agent for examination.[14]  Petitioner thereafter submitted a Federal income tax return for 1991 (on July 7, 1998) reporting realized gain of $296,741 on the exchange of the Third Avenue property for property described as the "Rankin Unit/oil field/in the State of Texas" and claiming nonrecognition treatment for the gain under section 1031.[15]  His computation included the claim that he had assumed a mortgage of $249,000 on the Rankin Unit property. Respondent issued a notice of deficiency determining that petitioner had failed to establish that he was entitled to exclude under the Code any portion of the gain from the disposition of his residential rental property.  The determination computed the gain on the sale on the basis of available information.  The determination concluded that petitioner must recognize capital gain of $451,888 for 1991 on the transaction.

On his Federal income tax return for 1992 (submitted on July 23, 1998, after the examination had commenced), petitioner reported realized and recognized gain

---

[14]Although the agent's letter referred to petitioner's "returns" for the years referenced above, it is undisputed that petitioner had not submitted returns for those years when the letter was sent.

[15]Petitioner reported that the Third Avenue property was transferred, and the Rankin Unit replacement property was identified and actually received, all on December 11, 1991.  However, on his Federal income tax return for 1992, petitioner reported that the Third Avenue property had been exchanged on January 28, 1992.

of zero on the exchange of the Montclair property for property described as "Oil & Mineral rights" with an address of "US/HNC, a Texas Corp. 50 S. San Gabriel Pasadena, 91107", pursuant to section 1031. His computation included the claim that he had assumed a mortgage of $320,000 on the property received in the exchange. In addition, petitioner reported realized gain of $628,471 on the exchange of the Las Palmas property for property that was not identified and claimed nonrecognition treatment for the gain under section 1031. The notice of deficiency determined that petitioner had failed to establish that he was entitled to exclude under the Code any portion of the gain from the disposition of his residential rental properties and recomputed the gain on the sales on the basis of available information. The determination concluded that petitioner must recognize capital gain of $479,543 for 1992 on the transactions.

Petitioner's Federal income tax returns for 1993 and 1994 were submitted on August 19 and October 5, 1998, respectively.

Petitioner's 1992, 1993, and 1994 returns did not report any income, expense, or other tax item arising from an interest in an oil and/or mineral property.

## Discussion

I.     Statute of Limitations

Petitioner argues for the first time on brief that the notice of deficiency is time barred because respondent failed to issue it within the three-year period provided by section 6501(a).

Petitioner did not plead the statute of limitations as an affirmative defense as required by Rule 39. Petitioner did not raise the issue during the evidentiary hearing, nor has he at any time moved to amend the pleadings so as to include this omitted affirmative defense. Petitioner's failure to plead the statute of limitations in his petition or in an amended pleading constitutes a waiver of the issue. Moreover, petitioner's raising of the issue for the first time on brief would prejudice respondent, who has been deprived of the opportunity to present relevant evidence, such as evidence that petitioner consented to extend the period of limitations. See Rules 39, 41; Long v. Commissioner, 71 T.C. 1, 5-6 (1978), remanded on other grounds, 660 F.2d 416 (10th Cir. 1981). We decline to consider this issue.[16]

_____

[16]We note that a claim that a notice of deficiency was issued after expiration of the period of limitations does not affect this Court's jurisdiction. See Tapper v. Commissioner, 766 F.2d 401, 403 (9th Cir. 1985); Badger Materials, Inc. v.

(continued...)

## II.    Section 1031 Deferral of Gain Recognition

### A.    Background

The Commissioner's determinations set forth in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are in error.[17]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioner contends that he is entitled to nonrecognition treatment pursuant to section 1031 with respect to the gains realized as a result of his dispositions of the Third Avenue, Montclair, and Las Palmas properties.  Respondent argues that petitioner has failed to establish that he is entitled to section 1031 treatment with respect to the realized gains for various reasons, including that he has failed

---

[16](...continued)
Commissioner, 40 T.C. 1061, 1063 (1963); see also sec. 7459(e).

[17]Petitioner also argues for the first time on brief that respondent bears the burden of proof pursuant to sec. 7491(a).  That provision is effective, however, only for court proceedings arising out of examinations commenced after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. No. 105-206, sec. 3001, 112 Stat. at 726.  The examination for the years in issue commenced with the revenue agent's letter sent to petitioner on December 30, 1997. Consequently, sec. 7491(a) is inapplicable.  See Seawright v. Commissioner, 117 T.C. 294 (2001); Sowards v. Commissioner, T.C. Memo. 2003-180.  Even if sec. 7491(a) were applicable, petitioner has failed to establish that he satisfied the requirements of sec. 7491(a)(2).

to show that he completed any of the claimed exchanges.  For the reasons set forth below, we agree with respondent.

Section 1001(c) provides that, except as otherwise provided in subtitle A of title 26 (covering income taxes), the entire amount of the gain or loss on the sale or exchange of property shall be recognized.  One exception is section 1031(a), which provides generally that no gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.  Such an exchange need not be simultaneous, so long as the property to be received by the taxpayer is identified within 45 days after the taxpayer transfers the property relinquished in the exchange and the identified property is received by the taxpayer within 180 days after the transfer of the relinquished property or by the due date of the taxpayer's return for the taxable year of the transfer of the relinquished property, whichever is earlier.  Sec. 1031(a)(3).  Pursuant to the regulations issued under section 1031, a "qualified intermediary" with which the taxpayer has entered into an "exchange agreement" may be used to facilitate a nonsimultaneous exchange of property.  See sec. 1.1031(k)-1(g)(4), Income Tax Regs.

After indicating in his pretrial memorandum that he intended to call numerous witnesses, including petitioner, petitioner's counsel opted on the eve of trial to submit this case under Rule 122 to be decided solely on the basis of various stipulated documents and a proffered third-party affidavit (which the Court ruled was inadmissible hearsay). The documents on which petitioner relies to establish that property exchanges occurred that give rise to nonrecognition of gain under section 1031 are incomplete and contain significant discrepancies. Petitioner's testimony and that of third-party witnesses familiar with the transactions might have addressed the gaps and discrepancies in the documents, but this testimony would also have been subject to cross-examination. In these circumstances, the failure to call petitioner or any other witness familiar with these transactions and documents gives rise to an inference that any such testimony would be unfavorable. See Wichita Terminal Elevator Co. 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947). After a careful review of the documents, we conclude as more fully discussed below that petitioner has failed to establish that he received like-kind property in exchange for the Third Avenue, Montclair and Las Palmas properties that he transferred during the years in issue.

B.     Third Avenue Property

With respect to the Third Avenue property, petitioner contends that the Third Avenue mineral contract that he executed to acquire a 25% interest in the Rankin Unit, coupled with the Third Avenue substitution wherein CLTC assumed his rights and obligations under the Third Avenue mineral contract, demonstrates (in the light of certain other supporting documents) that petitioner exchanged the Third Avenue property for a 25% interest in the Rankin Unit (using CLTC as a qualified intermediary).  Because of the numerous discrepancies and omissions in the documentation and reporting of the transaction, we disagree.

First, petitioner claims that the $202,321.21 held in his exchange account by CLTC as proceeds from the sale of the Third Avenue property was remitted to HNC as part of the consideration for the interest in Rankin Unit.  The evidence of such a funds transfer consists of two typewritten documents, each purporting to be petitioner's authorization of a bank wire of $202,321.21 to HNC, one dated January 18, 1992, and the other dated February 24, 1992.  Petitioner offers no explanation of why there are two versions of the purported bank wire.  Even if it is assumed that the later bank wire somehow substituted for the first, the purported bank wire documents raise other suspicions.  For example, petitioner has offered no explanation of why he wired the funds himself, since the $202,321.21 in proceeds

from the sale of the Third Avenue property was, according to other documentation, in CLTC's hands and CLTC was obligated pursuant to the Third Avenue substitution to make the wire transfer of $202,321.21 to HNC. The wire transfer documents invite further suspicion. While the account number of the transferee is listed, none is given for the transferor. There is no evidence, from bank records of either petitioner or HNC, that any such wire transfer ever occurred, nor are there any HNC records showing amounts due and/or paid for the sale of a 25% interest in the Rankin Unit.

There are other problems with the consideration involved in the transaction. On his 1991 return petitioner reported that he assumed a $249,000 mortgage on the interest in the Rankin Unit he received in exchange for the Third Avenue property, yet he offered no evidence of any such mortgage in this proceeding. Even if one assumes that the purported wire transfer of $202,321.21 was made to HNC and the $115,000 promissory note from the Third Avenue property buyer was assigned to it, there is no evidence that the balance of the purported $566,000 purchase price of the Rankin Unit interest was ever paid. In addition, there is no evidence that HNC's assignment to petitioner of a 25% interest in the Rankin Unit was ever recorded, reinforcing the doubt that he actually acquired such an interest. Finally, petitioner reported no income or expenses with respect to any interest in an oil and/or mineral

property on his 1992, 1993, or 1994 return, a fact which is difficult to reconcile with his contention that he acquired a 25% interest in the Rankin Unit in 1992 in exchange for the Third Avenue property.

The cumulative impact of the foregoing discrepancies persuades us that petitioner has failed to establish that he completed an acquisition of a 25% interest in the Rankin Unit in exchange for the Third Avenue property.

C.   Montclair Property

For similar reasons, we reach the same conclusion with respect to the purported exchange of the Montclair property.  In contrast to the Third Avenue property transaction, there is no evidence (such as a purported bank wire) that the initial remittance of $106,955.44 due to HNC under the Montclair mineral contract was ever paid--by petitioner, CLTC, or any other person.  While the Montclair mineral contract, executed on February 20, 1992, provided that petitioner "hereby pays" HNC a deposit of $106,955.44, the Montclair substitution, executed eight days later on February 28, 1992, indicates that CLTC was to make a payment in the same amount to HNC, strongly suggesting that the payment had not as yet been made as of that date.  Inviting further skepticism, HNC's assignment of the 25% interest in the Rankin Unit was made effective February 24, 1992--a date which precedes the date on which CLTC was purportedly obligated under the Montclair substitution to

pay the initial consideration of $106,955.44. We believe it unlikely that HNC would assign away a valuable mineral interest before receiving the agreed-upon consideration. Also, as with the purported assignment of the first 25% interest in the Rankin Unit in connection with the Third Avenue transaction, there is no evidence that the assignment of the Rankin Unit interest purportedly made in connection with the Montclair transaction was ever recorded, casting further doubt on the conclusion that petitioner completed any acquisition of the second 25% interest in the Rankin Unit. More problematically, there is no evidence that CLTC actually executed the Montclair substitution; the copy in the record is not signed on CLTC's behalf by any person, but only by petitioner and an HNC representative. Given the foregoing discrepancies, CLTC's apparent failure to execute the Montclair substitution, and the absence of any other evidence that the purported consideration of $106,955.44 was paid, we find that it was not.

As in the case of the Third Avenue transaction, there are additional problems with the consideration purportedly paid for the second 25% interest in the Rankin Unit in the Montclair transaction. On his 1992 return petitioner reported that he assumed a $320,000 mortgage on the interest in the Rankin Unit he received in exchange for the Montclair property, yet he offered no evidence of any such

mortgage in this proceeding. Also similar to the Third Avenue transaction, even if one assumes the initial $106,955.64 payment was made to HNC and the $98,000 promissory note from the Montclair property buyer was assigned to it, there is no evidence that the balance of the purported $412,000 purchase price of petitioner's second 25% interest the Rankin Unit was ever paid. In addition, there is no evidence that HNC's purported assignment to petitioner of an additional 25% interest in the Rankin Unit was ever recorded, reinforcing the doubt that he actually acquired such an interest.

We also observe that petitioner purportedly acquired the two 25% interests in the Rankin Unit one month apart--yet the first was priced at $551,000 and the second at $415,000 (excluding the equipment purchased). Petitioner offers no explanation of the significant price difference. While the Third Avenue mineral contract contained a buyback clause that is absent from the Montclair mineral contract, there is no explanation concerning whether and to what extent that provision might account for any of the price difference. On balance, we are persuaded that the price difference, absent any effort at an explanation, also casts doubt on whether either acquisition occurred.

Finally, petitioner reported no income or expenses with respect to any interest in an oil and/or mineral property on his 1992, 1993, or 1994 return, a fact which is

difficult to reconcile with his contention that he acquired a second 25% interest in the Rankin Unit in 1992 in exchange for the Montclair property.

As with the Third Avenue transaction, the cumulative impact of the discrepancies persuades us that petitioner has failed to establish that he completed an acquisition of a second 25% interest in the Rankin Unit in exchange for the Montclair property.[18]

D.    Las Palmas Property

The purported exchange transaction covering the Las Palmas property warrants less discussion. Although petitioner claimed that the gain realized upon the transfer of the Las Palmas property was subject to nonrecognition treatment under section 1031, on his 1992 return the property received in exchange for the Las Palmas property was not identified. In this proceeding petitioner proffered a June 12, 1992, contract that he

---

[18]Petitioner points to six memoranda in the record discussing Rankin Unit(s) and/or Rankin Field matters, dated from April through August 1992, as evidence that he acquired interests in the Rankin Unit as claimed. The first five memos do not contain petitioner's name, and there is no evidence of the circumstances or capacity in which he obtained them. They do not persuade us that petitioner acquired the interests he claims. The last memo names petitioner (among others) as a recipient, but there is no indication of the capacity in which he received the memorandum. Thus, at most the memorandum establishes that petitioner had some relationship with the Rankin Unit or Rankin Field, but it does not persuade us that he acquired a cumulative 50% interest in the Rankin Unit, or the "Vicksburg Zone" thereof, as a result of the property exchanges he contends occurred.

entered into with CLTC under which CLTC agreed to act as his intermediary to facilitate an exchange of the Las Palmas property. Also in the record is the Las Palmas mineral contract dated June 16, 1992, which, similar to the other two mineral contracts with HNC, provided for petitioner's purchase from HNC of the oil and mineral rights of the "Vicksburg Zone" of the Rankin Unit. Likewise there is a substitution agreement, the Las Palmas substitution dated June 30, 1992, which substitutes CLTC for petitioner with respect to the Las Palmas mineral contract. Thereafter, the evidence evaporates. There is no evidence that HNC received any of the consideration called for in the Las Palmas mineral contract,[19] that HNC made an assignment to petitioner or CLTC of any interest in the "Vicksburg Zone" of the Rankin Unit, or that an assignment of this nature was ever recorded.

In sum, there is a total failure of proof that petitioner completed an acquisition of an interest in the "Vicksburg Zone" of the Rankin Unit.[20] The fact that petitioner has steadfastly maintained that he did so in the face of this failure of proof,

[19]In this regard, we note that the record contains a copy of the deed of trust securing a $64,000 promissory note to petitioner from the purchasers of the Las Palmas property (which deed of trust had been recorded), but no evidence that the deed or note was ever assigned to HNC.

[20]We note also that petitioner did not report any income or expenses from an oil and/or mineral property on his 1992, 1993, or 1994 return, a fact which is difficult to reconcile with his contention that he acquired an interest in the "Vicksburg Zone" in 1992 in exchange for the Las Palmas property.

or of any explanation of the absence of documentation, damages his credibility with respect to the claims advanced for the other two transactions.

E.    Conclusion

We find that petitioner has failed to establish that he acquired like-kind property in exchange for the Third Avenue property he transferred in 1991 or the Montclair and Las Palmas properties he transferred in 1992. As petitioner has offered no other grounds for nonrecognition of the gains realized on those transactions, we sustain respondent's determinations that he had capital gains of $451,888 for 1991 and $479,543 for 1992.[21]

III.    Additions to Tax and Penalties

Respondent determined that petitioner is liable for additions to tax under section 6651(a)(1) for failure to timely file returns for 1991, 1992, and 1994. As petitioner has stipulated that the returns for the foregoing years were all filed in 1998 and has not contended he had reasonable cause or otherwise addressed the additions specifically, we sustain them. See Rule 34(b)(4).

Respondent also determined that petitioner is liable for accuracy-related penalties under section 6662(a) for 1991, 1992, and 1994 on the basis that the

---

[21]Petitioner has not challenged respondent's computation of the amounts realized upon petitioner's disposition of the three properties at issue.

underpayments for those years (which we have sustained) are attributable to negligence or disregard of rules or regulations under section 6662(b)(1) and/or to substantial understatements of income tax under section 6662(b)(2).

For purposes of the accuracy-related penalty, "negligence" includes any failure to make a reasonable effort to comply with the Code, and "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). "Negligence" for this purpose also includes a taxpayer's failure to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Proced. & Admin. Regs.

The accuracy-related penalty does not apply to any portion of an underpayment if the taxpayer shows that there was reasonable cause for, and that he acted in good faith with respect to, such portion. Sec. 6664(c)(1).

Petitioner bears the burden of proving that he is not liable for the accuracy-related penalty. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. at 115; Neely v. Commissioner, 85 T.C. 934, 947-948 (1985).[22] As previously discussed, petitioner failed in very significant

---

[22]Sec. 7491(c), which imposes the burden of production on the Commissioner with respect to a taxpayer's liability for any penalty, is inapplicable in this proceeding because, as previously discussed, the examination for the years at issue commenced before July 23, 1998. See RRA 1998 sec. 3001(a).

respects to substantiate that he effected exchanges of the Third Avenue, Montclair, and Las Palmas properties for like-kind properties (as provided in section 1031), notwithstanding his position in returns for 1991 and 1992 that like- kind exchanges of those properties occurred. Petitioner did not even contest the other adjustments for those years or for 1994. See, e.g., Woody v. Commissioner, 19 T.C. 350, 354 (1952). Accordingly, his negligence with respect to the underpayments for 1991, 1992, and 1994 is clear.

Petitioner's sole argument with respect to the accuracy-related penalties determined is that "sufficient information was disclosed on the returns". Presumably petitioner is asserting the section 6662(d)(2)(B)(ii) defense of disclosure which, if satisfied, would apply only with respect to any penalty premised on a substantial understatement of income tax. Because we conclude that the underpayments for 1991, 1992, and 1994 are attributable to negligence, it is unnecessary for us to consider whether they are also attributable to substantial understatements, including petitioner's challenge to that proposition.

Consequently, we sustain the accuracy-related penalties determined for 1991, 1992, and 1994.

IV.   <u>Conclusion</u>

We have considered all the remaining arguments made by petitioner for results contrary to those reached herein.  To the extent not discussed, we conclude those arguments are moot, without merit, or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.